EAST BAY TAXI DRIVER Good morning, Your Honor. Your Honors, Alex Berlein on behalf of respondents and cross-petitioners to taxi companies in this case. The issue before the Court is whether the relationship between my clients, the cab companies and the drivers is that of independent contractor or that of employees for the limited purpose of NLRB under the Act and therefore the ability to vote to be a union. The reason we're here today is although the NLRB Board has very broad discretion in this issue and we concede that, it cannot arbitrarily treat similar situations into similar ways. And I'm quoting from the Carnation case from this circuit. Merely asserting that circumstances are unique or unusual does not provide the proper guideline for future exercise of the Board's explanation why his case is being treated in a certain manner. But isn't this case different from Carnation where the advertisements were actually for Carnation? There an argument can be made that both the company and the drivers are benefiting from promoting Carnation. Here there are no benefits to the friendly drivers since the advertisements are for outside companies and the drivers see none of the advertising revenue. Well, Your Honor, the advertising or the T-tops on top of the cabs I would submit is but one of multiple factors and I think one that should receive the least amount of importance here. There are advertisements with our competitor with veterans' cabs. I don't recall off the top of my head if there were advertisements in CETA. But there's no evidence in this record of how much revenue that generates, whether it's 1 percent or .1 percent. The law allows that a little amount of compensation go to the employer without creating an employee-employer, whether it's a significant amount. And there's nothing in this record that would allow either the hearing officer or this Court to say that it met that threshold. The fundamental factor and the one that this Court has stated in the CETA decision, which is, according to my research, is still the controlling case in this area, is the incentive. And I'm reading from the opinion. The essential ingredient of the agency test is the extent of control. So are you reading from the dissent or the majority? The majority. Okay. This is the... Well, given the extent of control, isn't the you require your cab drivers to have an exclusive relationship with your company, right? Well, exclusive in what sense, Your Honor? Unlike, say, delivery company, where there have been cases where even delivery companies found to be independent contractors. In a delivery system, a truck is sent to a client of the company. Taxicabs, Your Honor, the vast majority of fares are individuals. Well, but that's not true, because I frequently, like, if I take a cab, then I say, well, you know, I'm going to be leaving on Friday. Can I call you to come and pick me up? Can I, and the friendly cab drivers can't take that business. They have to give out a friendly card and say, call, you know, say, I really like that cab driver. I've had a, you know, and I want the same, you know, I thought they were really on it. They got there directly. I can't have that same cab driver. I have to call friendly and whoever friendly gives me, right? Well, Your Honor, Veterans, Friendly, and even CETA had radio or computer dispatch systems. I would suggest if you want to stay with that company, you have to call that number. It's no different for my company or my competitor or CETA. But Veterans can have cell phones, can't they? Well, Your Honor. And can't they get a call from, if Judge Callahan wants her favorite Veteran cab driver to pick her up, he can give her his cell phone number and she can call him up and say, okay, John, be here at my hotel at 530 in the morning. That's absolutely correct, Your Honor. And yet friendly cab, they are forbidden to have cell phones. Well, Your Honor, I would submit that. And you say, well, the rule isn't enforced. Well, the rule is there, right? It was there, yes. I concede the point, Your Honor. But I think everyone in this courtroom who has taken a taxi, I would challenge you to find a driver who doesn't have a cell phone and is usually using it during the ride. Well, I don't think that is an issue for us to consider. On the record, before the Board and before this Court, the friendly cab has a rule that drivers cannot have cell phones and cannot take reservations for pickups except through the friendly cab dispatch board. I don't dispute the point. What I dispute is that I challenge this Court and my learned colleagues to find any evidence in the record of what percentage of business this comes to. Why does that make any difference in terms of the issue of control? Because the law does allow for the employer to make a little revenue from the activities of the drivers. The drivers are more productive. You can get a little extra revenue. For example, percentages on credit cards, et cetera. What the law doesn't allow is a substantial portion of the revenue. So we talk about these differences in the business, and I concede there are differences. That's not my point. But not allowing people to have a cell phone is probably the most controlling behavior in this day and age that you can engage in. Ask anyone that's got kids with cell phones. You know, when you want to control them, what do you do? You take away their cell phones. I mean, it's almost like not even allowing people to have cell phones, it's putting them at risk and danger. I mean, it's a very paternalistic type, you know. I mean, we all rely so much on our cell phones now that that's one of the most controlling behaviors I can think of in this day and age. Well, that conceded. But a couple of points. Number one, there are a number of states that are either in the process or have passed laws barring the use of cell phones while driving because it's dangerous. California just passed a law that is going to allow cell phones, but you have to have an earpiece or Bluetooth technology. But here's my point. Both veterans and friendly, most of their business in the high revenue and the high gate vehicles go to the airport. When you go to the airport, you cannot call ahead for specific pickup. You cannot select your driver. You take the next cab in queue. Those are airport regulations. Why does it make any difference in terms of the control? Traditionally, when we talk about the test of control over independent contractors or employees, we look at the right to control, not necessarily how control happens in practice. It may be relevant, but you are given the right in your contract to a substantial amount of control over what these cab drivers do. With all due respect, Your Honor, I really must disagree. When we lease the cab and the driver hits the end of the driveway, they may go left, they may go right. They may go to a taxi stand. They may go to the Hilton. If they have an airport permit, they may decide to go to the airport. There is – I would suggest to the Court that the vast majority of revenue is derived for airport drivers from picking up fares at the revenue and taking them to their location, that, in fact, most of those drivers return empty to go back to the airport to get the next fare, that the street drivers go to businesses, hotels, and city-designated taxi stands. That's where the vast majority of the revenue is generated. I can see that there are drivers that have some regular business call on cell phones. What about don't mess around with Mrs. Singh? You know, I mean, she certainly, you know, you get a fine for opening your mouth. Well, Mr. and Mrs. Singh came to this country in the 70s and worked as bank tellers at B of A, and Mr. Singh moonlighted as a taxi driver. So they have worked their way up from the bottom by their own bootstraps. And the taxi industry, I don't say this is an exact portrayal, but if you've ever seen the TV show Taxi, there are some interesting characters in the taxi industry. It's a difficult business to manage. But both veterans and friendly are mandated by the city to have a fleet manager to keep the fleet under control. If you look, and we spent some time in our reply brief with the appendix, if you look at each and every aspect of control, be it dress, be it cleanliness, be it how many times you wash the car, everything is laid out by either an airport regulation or the Oakland regulation. The only difference with my company is we essentially amalgamize these rules and put them into the manual and the standard operating procedure so the drivers would have them. And effectively, we're being penalized for that. I concede the cell phone issue. But where the rubber meets the road, it's just not that big of a deal. It's not that much control. And there's nothing in this record to suggest that it's a lot of control. You had mentioned, and I gather that there is nothing in the record to indicate a friendly cab driver, what percentage of his business is done cruising or at taxi stands versus being given assignments through the dispatcher. Is that correct? That is correct. And I would suggest that if the very talented lawyers for the union who handled the representation hearing had that evidence that the drivers, for example, at Veterans were generating 30 percent of their income on cell phones, that would have come in. And you'll find it interesting in the record that of the four or five driver witnesses, there's no question such as isn't it true you can't use your cell phone or that it's 30 percent of your business. There's simply nothing in the record. And the cold, hard fact is the truth, which I think plays some role in this process, is that it's not a large percentage of their income and, in fact, the friendly drivers has to look. The lease was written before cell phones became as prevalent as they are today. Things change. Should my clients have updated the lease? Of course they should have. But the cold, hard reality is the time this representation was heard, the drivers were using cell phones. There's nothing in this record to show what percentage of income was or was not deprived. And if there's any ---- I wasn't talking about cell phones. I was talking about cruising or taxi stands as opposed to being assigned pickups by the friendly cab dispatch center. I will concede that I don't think there's evidence either one way or the other on what the percentages are. But if this hearing officer was relying on control, and I concede that one difference between my company and my competitors is this whole cell phone issue, I think that at a minimum there would need to be in the record a finding of what percentage of this business. Because let's say hypothetically it's as little as ---- But we don't go back and give you second bites. No. But the rules are that the ---- look, this is a big deal. My client's dispatch yard is just a half mile away from veterans. If we have to adopt the administrative burdens of unionization and following all those proceedings, we have an additional cost level that we have nowhere to pass on. So why should we be treated differently? And I would humbly suggest that this rule about cell phones, which is no longer there, is not enough. And if we're going to make this diametrically opposed decision about two competitors in a very tight market, you'll notice the gates, the lease fees are exactly the same. Well, but it isn't. But that wasn't the only difference that they found between veterans and friendly. It seemed to me that maybe the main difference was that veterans allows the drivers to solicit independent business. Well, but solicit independent business, if I'm sitting on the road and I go, How is that not soliciting independent business? If I'm at the Hilton Hotel and I call up the next cabin queue, that's independent business. Well, the record is what the record is. And you start with a strong inference because there's a flat rate, and then there's other evidence presented. You know, don't you have a little trouble pushing the rock uphill just because of some deference that is allowed aboard determinations? There's no question. But as Your Honor just correctly stated, we start with the strong presumption that there's independent contract relation. I would say that this Court needs to look carefully at whether that strong presumption was rebutted. And in the taxi industry, when the driver has all of these opportunities, they can take computer dispatch, they cannot take computer dispatch. Well, they must accept all reasonable customer calls from dispatchers or be terminated, right? No. That's actually from CEDA. The dispatcher, if a number of calls are not taken, the dispatcher can drop them to the bottom of the queue, as can the dispatcher at Veterans. And in the CEDA case, where the finding was independent contractors, the driver could be terminated. Well, I think there's kind of a quote in here about what happens when you don't take a call or you don't respond quickly enough. Wasn't there a quote in the record? I think something about, well, I remember it was another one of the interesting taxi moments. I would submit that. Well, the NLRB made that finding, as I recall. Drivers may not discriminate against customers and must provide service in response to any reasonable request. All calls for services must be conducted over an employer-provided communication system. Drivers may not provide individual business cards or phone numbers to customers or develop their independent relationship with individuals or businesses. That's in the finding. And if I'm looking at the correct procedures, and I may be wrong, I'm looking at 602 of the record. I'm sorry, 600 and 601. It does have those requirements in it. Nor may the friendly driver sublease the cab, where my understanding from the record is that the Veterans cab drivers can sublease their cab. Just to answer the first question, the requirement that all customers in the City of Oakland be served in a timely fashion, that's part of the Oakland City Ordinance, which was simply almost copied verbatim into our manual. The issue of subleasing is very interesting. The problem with subleasing is both Friendly, Veterans, and CETA all provided the liability insurance coverage. The difficulty with subleasing is if someone says, hey, Charlie, take my cab, that sounds reasonable. But if Charlie has three DUIs, it raises an issue both for the insurance company and for the cab company, who might have some liability there. But the issue for us, does Veterans allow subleasing and Friendly does not? My reading of the record is that both companies require the proposed subleasor to essentially sign a lease, because the names and driving records need to go through the insurance company. And for the City of Oakland, the proposed subleasor must actually have a city permit, or in the case of the airport, have an airport permit. All right. If you sign your own lease, you're not subleasing. True. Okay. So does Veterans, does Friendly allow subleasing? No. Does Veterans allow separate leasing? They may call it that name, but I would suggest to this Court that if you have to come to Veterans, submit your driving record, submit to the insurance company, show your license, et cetera, that is really not a true sublease, it's really a new lease altogether, just like my client does. Do you want to reserve some time for questions? I would. Okay. Thank you. Good morning. May it please the Court. My name is Meredith Jason, and I represent the National Labor Relations Board. I would like to give five minutes of my time to the intervener, the East Bay Taxi Cab Drivers Association. I submit that there are five critical distinctions that differentiate this case from CIDA and the other cases relied on by the company that fully justify the Board's finding here. And these critical factors demonstrate that these cab drivers have no true entrepreneurial opportunities to build a business and that the company controls the manner in which they perform their job. First, these drivers are not allowed to develop any client base. As Your Honors pointed out, they are not allowed to use cell phones. The general manager on page 60 and 61 of the transcript specifically testified they can't have cell phones, they can't use cell phones whether the cab is they can't have them, period. And they can't, he said, there's no reason to have cell phones. Why would they have cell phones? And that's his testimony. They can't give out their own business cards. They can only give out the company's cards. They can't give out any type of contact information for themselves. And if they can't truly build their own customer base, how are they going to run a business of their own? Second, they have to accept the dispatches from the company. They cannot refuse calls. The standard operating procedures on page 601 of the appendix specifically states drivers must service all reasonable customer calls from dispatchers. And there's further testimony in the record that drivers who dare to turn down a dispatch from the friendly dispatcher are, they're not merely moved to the bottom of the list. They are, there's on page 445, one of the cab drivers testified that when he actually picked someone up, got a fare up at the BART station and then had to turn down a dispatch because he already had a passenger, he was not given another dispatch the rest of the day. And once again, how can they run a business if they pick up a customer, pick up a fare from either a taxi station or a BART station and then are denied any dispatches the rest of the day? So I would say those two factors in combination essentially prevent them from getting any of their own passengers. They'll get passengers exclusively from the company. The third critical factor is the accounts that the company has set up with private corporations. The company has numerous lucrative accounts with other corporations to take their employees, pilots, sometimes packages and other fares. And not only are the taxi cab drivers required to take those account passengers, they have to turn over a percentage of the fare to the company. That percentage can range from 10 to 30 percent of the fare, and they would otherwise be taking metered passengers who would pay the full fare to the taxi driver. Aren't these the overflow? It is overflow, and it is unclear from the record how much, but that almost shows, but that shows control in itself, that friendly cab can require their drivers to take overflow from a related company. They direct them to take these overflow passengers, and then they turn around and take 30 percent of the fare. And not only does that ‑‑ What about the script? Just explain that to me. What significance does that have? The company has entered into contracts with municipalities as well, and the script is ‑‑ from the record, it seems that it's given to senior citizens and other qualified people, and they give the cab driver the script instead of cash, and then the taxi cab driver turns that over to the company, and the company keeps ‑‑ the company no longer keeps a percentage of that, is my understanding. And other cab companies do that. I wouldn't say that that is a critical factor here. It doesn't distinguish this case from other cases. That seems to be pretty common, that they enter these city contracts. When you say turns it over to the company, do you mean to friendly? They turn it over to friendly. Because there was some testimony in the record about someone tried to get paid from, I don't know, the airline or something, and they said, no, you have to go to friendly. Yes, yes. And similar to credit card, when they get a credit card slip, that driver did testify, he tried to turn that in directly to the credit card company so that he wouldn't have to give up 6% of it to friendly, and that he wasn't able to do that. And, again, although that is a factor that supports control, that the taxi drivers have to take credit cards, and not all cases do they, it is not one of the most significant features, and it doesn't necessarily distinguish it from some of the other cases. But it is a significant factor in that some companies don't make them take credit cards. And once they do make them take it, they have to accept it, and then they turn over a percentage to the company. And, in addition, the accounts, not only does it hurt the taxi drivers economically, but it makes, it creates a relationship between the company and the drivers, an economic relationship that doesn't otherwise exist in these flat lease relationships. In cases such as the City Cab of Orlando and the D.C. Circuit, they relied on that type of economic relationship to show more control by the company over the taxi cab drivers. How about, and I can't remember, there was mention that they had to go to discrimination training. Yes. As part of that, did veterans have to do that, too? I believe that that is mandatory training. There is some mandatory training that the municipalities require for the taxi cab drivers to go to, and I think that had involved ADA and. . . So that's not really something that says a company is trying to limit its liability to train its, to make sure that their drivers don't do, you know, they don't want to get sued. Right. My understanding is that, at least in this area, all drivers have to have a certain basic training as required by the municipalities. But what Friendly required, and this is another important factor, is training on its own particular rules and procedures that, contrary to the company's assertion, do exceed the government regulations. And they have more detailed dress code. Their dress code applies to all drivers, not just the airport drivers, which we certainly agree, the airport drivers have a dress code, but the airport drivers can only actually drive at the airport every other day, and Friendly requires them to follow the dress code on all days, and it requires the street drivers to follow the dress code as well. And they have very specific regulation of their own rules about how to, when to pick up a passenger, how to assist passengers, how to load luggage, how to, where to pull up on the curb. I mean, beyond not pulling up in front of a fire hydrant, which nobody's supposed to do that, but they have detailed rules about don't pull up in front of a puddle and don't do this. And those exceed the government regulations, and they're required to attend training on the, to learn all of these rules. And they risk termination of their lease if they don't, if they don't follow the rules. Now, I can see that there aren't instances in the record where it's clear that people have been fired for, or their lease has been terminated for violating some of these minor rules, but the standard operating procedures in the policy manual flat out say that they can be. And it isn't necessarily that the company has exerted that control, but if your policy manual says you can be fired for doing those things, you know, for not following certain rules, that certainly is an aspect of control. Is there any difference with the, the regional director was the one that did the veterans cab, right? Yes. And that wasn't reviewed by the board? That was not reviewed by the board. Now, is that, do you, does that, is that a distinction without a difference, or what is it? No, that is, that is huge. I mean, the board has not reached any decision on veterans, and it cannot. It was not, there was no appeal to the board taken, no request for review is what we call it. And unless there's a request from review, request for review, it's just a non-precedential regional director's decision that has absolutely no value. It is not, the board, the board did not make that decision. The board did not review it. So you can't argue that the board acted arbitrarily because the board didn't act. The board only acted in friendly. So case law is held, and I think Corporate Express and the D.C. Circuit has said it fairly recently, that an unreviewed regional director's decision has absolutely no precedential value. And it's, I mean, frankly, it's entirely irrelevant to this case. Well, there is some relevance to it, I think, and it's, at least it's persuasive in some respects. But I gather your argument is there differences between the two cases anyway. Well, there, first of all, the R.D. could be wrong. I mean, the board didn't rule on it, and it never will be appealed. But second, there are very significant distinctions, and I, and Your Honors have reviewed some of them. I mean, they, those taxi cab drivers can use cell phones, they can set up their own calls, they can, clients can contact them, set up their own schedules for pickups and drop-offs. They can sublease to approve drivers during vacation. They can refuse dispatch calls without any type of reprisal or punishment. It's possible that they could get moved to the bottom of the queue. But that's, but that's, but Friendly went far beyond that. They can use their cab for personal business. And Veterans maintains no policy manual or standard operating procedures, unlike Friendly. And the fifth factor that I think is very significant, it has to do with the advertising. And it's not merely that the cabs have the advertising on the roof and that the money goes directly to the company. That doesn't appear uncommon. But Friendly requires their drivers to come in to have that advertising changed during the course of a business day when they would otherwise be driving passengers. They can be called in from 20 miles away, they can be called in during rush hour, they can be called in whenever Friendly feels like it to have the advertising changed on their roof. That can take from 15 minutes to two hours, during which time the drivers are in no way compensated for their lost fares. And that is different than any case that certainly that the company relies on, though, that I'm aware of. I'm not aware of any case in which the company exerts such control that it makes them come in to have that done during a time when they'd otherwise be working. The one last point I'd like to make is that, you know, it is the company's burden to prove independent contractor status if they believe that these drivers are independent contractors. And so to the extent that they're saying there isn't things in the record, there isn't this percentage shown, there isn't that, they had the burden to show that these drivers actually used cell phones. Did the board give them the inference? I mean, the flat rate, didn't the board say? Yes. Okay. Yes. And so didn't the board a little bit say, okay, you've met that hurdle? They'd met that hurdle. But to show that, particularly with respect to the cell phones, if they're claiming that their drivers really use cell phones, then the drivers are up there testifying. They certainly could have cross-examined them and said, do you have a cell phone in your car? Do you use your cell phone? Do you set up customer, you know, pickups using your cell phone? Their general manager specifically testified that they can't have cell phones and that they don't do that. So to suggest that there's some failing on the board's part for not being able to point to such evidence is just wrong. And the evidence in this record is very clear, and it strongly supports the board's finding that these drivers have no entrepreneurial opportunities, that the company controls the way they do their job. And, therefore, I submit that the board's finding that the company violated the act by refusing to bargain with this union should be enforced by this Court. Thank you, counsel. Thank you. May it please the Court. Karen Sensor on behalf of the intervenors, the East Bay Taxi Drivers Association. Why don't you move your microphone down just a little bit so we can hear you. I gather you represent what the company called the unfriendly cab drivers. The unfriendly cab drivers. The East Bay Taxi Drivers Association and Teamsters Local 70. And what I'd like to discuss here today is how the decision being made by the board interacts with and works with the State law on this. Now, California is considered to be pretty liberal in its protection of employees for the most part, just as the act is designed to protect as many individuals as possible as employees, which is why there is a presumption that there is an employee status, and it is up to the party disputing that status to prove the independent contractor status. The California test and the Federal test are quite similar. The Federal test, the agency test, uses a right of control standard. The same factors that are used in that are used in the California test, but the California test is known as an economics reality test. I think that makes more sense in this situation, because when you look at what actually happens here under a control test, you see that, well, California would say that there's no need to show complete control because there's pervasive control based on the nature of the work and the way the work is distributed. That would be the dispatch system. If you have to accept the cause from dispatch, then you have a pervasive control over you regardless of what else you call it. And we know that drivers have to accept the dispatch because it's an economic reality to have continuing work inside the city of Oakland. How is that really different from the way veteran cab drivers are treated? Veteran cab drivers do have the right to refuse the dispatch. Well, I think in practice the friendly cab drivers do as well, except that they testified they wouldn't get any calls for the remainder of the day. So they are negatively impacted or controlled to take that dispatch at the threat of losing potential income at the end of the day. Right. I mean, I think both cab drivers can refuse it. There may be some different economic impacts. It's hard to tell just from the veteran's record because we just have the decision from the regional officer. But there was some consequence. It went down to the bottom of the dispatch call, as I recall, in the veterans. That is correct. But here there's a way for you to actually wind up being taken off the list for the day altogether and not receive any other dispatches regardless of how many other times other drivers who have been accepting dispatches have taken dispatches or their spot is in the queue. They consistently jump you under the friendly system. There's no evidence of that in the record from what happens in the veteran system. In addition, the requirement of taking the voucher would also be another nature of this control where your lease could basically be terminated for not taking the overflow from the company. So I think that the control there is prevalent in the pervasive sense and that the company maintains what California would see important as an interest in the driver's performance as drivers rather than simply as lease property. Now, California has made this decision twice, once in the case of a workers' compensation appeal, once in the case of an unemployment insurance appeal. And in both cases, they determined that the cab companies are not simply acting as leasing agents. If they were just acting as leasing agents and did not have any other contact with the driver other than to collect the gate at the beginning of the week, then perhaps there would be a situation where you'd have an independent contractor. But what you have for the cab companies that were reviewed by the California Court of Appeals and what you have with Friendly is something that's more pervasive than that. Both all look at more than simply the lease money that is provided on a weekly basis off of the gate. They hold themselves out for public carriage. That would be the company. It's the company's name that's out there. It is the company, it's Friendly, that the public calls, not a particular driver, when they're looking for a ride. It is the company that maintains the municipal licenses here. The permits do not actually belong to the individual drivers. The driver doesn't have the ability just to go out, buy a car, and start up their own cab company. They have to be going through someone who has that permit, and with that permit comes particular control from the company. In addition, neither of the companies that were reviewed by the Court of Appeals in California, nor Friendly, has the ability to survive as a corporate entity doing what it does without the drivers. That makes the drivers an integral part of the relationship. And under both the Federal test, the Federal common law test, as restated in the restatement of the second of agency, and in the California economic realities test, the integral part of the business is actually quite important. Friendly couldn't do what it does if it did not have these drivers driving on a daily basis under the rules and regulations it's put out the same way it couldn't do what it does if the cabs themselves were not maintained and working. And that's probably one of the reasons why Friendly requires the cabs to come in on a weekly basis for maintenance, to keep the company running. Well, the same thing would be true for veterans, right? Is it really your position that veterans ought to be subject to the same consideration? I'm gathering that from your argument. I was not counsel in the veterans case, or Friendly at the lower level. But I would say that veterans seems to operate in pretty much the same manner when it comes to those issues of maintenance. But it does seem to have less control overall over its employees, over the drivers, excuse me, when it comes to how the drivers are able to build their own business. So you would say that there are distinctions, but in terms of whether they both should be subject to unions or the Act, you would say they were distinctions without a difference. You'd say they both really should be sitting, that veterans should be sitting over there with Friendly. In my ideal world, yes. But we don't have the right here to review what happened for veterans. I think veterans got pretty lucky that some of the differences that it does have were taken to heart. And I think one of those differences actually wound up being highlighted when the Board had the opportunity to review Friendly, in that the Board made an additional finding on the value of the vouchers themselves. And those vouchers actually came out to be a very important part for the Board and were not mentioned in the record in Friendly as to their situation. Are the vouchers a significant portion of a cab driver's income? There is no record of that. But I would submit that the important portion about the voucher is that the driver does not have the opportunity to assess the economic value of that voucher prior to being required to accept it. So it takes away a bit of the driver's control over their own economic losses and gains. And it increases the company's control by taking a larger percentage of that voucher based on the value of the voucher without disclosing that to the driver before they have to accept the run. Thank you, Counsel. Thank you. Your Honors, a couple of points. There was no way, of course, for my clients to appeal or challenge the Regional Director's decision for veterans. To the contrary, we agree with it. We think it's right. But Counsel suggested that veterans got lucky. I would like to think that our rules and procedures and jurisprudence has a slightly tighter standard than that. And, again, going back to carnation, you can't be treated dissimilarly merely because there's unique or unusual circumstances. We really have to look at the actual details here. And, you know, we're focusing in the taxi industry. Look at the other industries where the courts have found that you can be an independent contractor. Name me another industry where as soon as you drive your vehicle off the lot, you can go home and watch TV for a week. You have that freedom as a taxi driver. You have the freedom to go wherever you want. The idea that the employer controls the detail of the work, turn left, turn right, drive fast, drive slow, hit the brakes, there's none of that control here. Are there some elements of control with vouchers, with percentages on credit cards? Of course. But I don't see that this regional director or the board had anything in the record to talk about the percentages, how much control. These were just assumptions that were made. And I don't think luck and assumptions should control the day here. One of the questions to me, was there any evidence in the record or the decisions about percentage of work? And reading from the Veterans Decision PER 0559, one driver called as a witness by petitioner testified that 80% of his business involves picking up customers at various BART stations. The BART schedule is published, you drive to the station, you pick up the customers. There's no control by the company on that. I think if you look at the record, the dispatch systems are remarkably similar. And I want to go back to the fundamental point. My client does not mind having a union. This is not a union busting type case here. What we object to is being treated differently for apparently entirely subjective reasons. And again, I don't think luck should carry the day here. I think that this should be remanded for the hearing officer to decide specifically percentages, how much money, what are the differences here between friendly and veteran. If we don't survive that, that's fine. But I think on this record, it leaves a bad taste in my client's mouth that we were treated differently for some. What if veterans was decided wrong? Well, the union, I suppose, is free to try again for the certification process. But in the end, there are many industries, of course, where union and non-unionized businesses work side by side. But in those instances, because the employees in one company voted, we don't want to be a union. For example, the auto industry. There are plenty of non-union autos. But here we have a situation where if we don't prevail here today, we are going into the realm of negotiations and unfair labor practices and all the administrative and legal expenses that entails. And none of our competitors, under a fixed government-sanctioned monopoly where the price, the meter flag, is set by the government, the rules, the regulations, the permits, the number of permits, everything is regulated, our competitors don't have to do the same. How do we compete? You sound to me like you're getting into the fairy godmother jurisdiction. That we should say, gee whiz, it ain't fair, we will make it right. But I'm not sure we can do that. I'm not saying gee whiz, make it right. What I'm saying is in order for us to be found different than veterans, I think we need a record that says what percentage of business is coming from these activities. If there's a finding by the hearing officer that 90 percent of income comes from prearranged cell phone calls, say from the judges on this panel, fine. But I think you'll find, as this one driver testified in veterans, that 80 percent of his fares comes from randomly picking people up at the BART station, that that's how the majority of the income is reached here. And there is an entrepreneurial element to a taxicab. Again, you drive off the lot, whether you go left or right, that's based on your experience. The more experienced drivers know where the people are. It's a little bit like fishing. You need to know where to go on the lake. What time do BART trains arrive? Is there a convention in town? Do I go to the Hilton? Do I go to the Marriott? Do I go to the airport at 2 in the morning? Do I go at 9 a.m.? These are all subjective decisions that the driver makes. And some drivers make a lot of money and some drivers don't make that much money. And one final point, at least as to the East Bay Drivers Association, their very first thing when they won this case, what did they do? They sued my client for not paying minimum wage, not doing this, not doing that. We spent four years in a lawsuit. And at the end of the day, when we filed our motion for summary judgment, they were independent contractors, didn't even file an opposition, and we won. So if they want a state law that controls this case, well, I agree. We're entitled to collateral estoppel on that issue. I will concede the NLRB is not so bound, and I think it's an open question. But I think the Ninth Circuit has said it files generally their restatements as opposed to California law. But I don't think it's consistent. I don't think it's fair. But the reason it's not fair is I don't think it was a reasonable decision, and I don't think there's enough in this record to meet the carnation test that ‑‑ because I think all that happened here was the hearing officer decided that there are unique and unusual differences here. Fine. I concede it. But the actual matter of fact, the percentages, the revenue, that sort of detail wasn't developed, and I think it needs to be. Thank you. Thank you, counsel. The case has heard will be submitted and will be in recess for the morning. All rise. The case has heard will be submitted and will be in recess for the morning. Thank you. The case has heard will be submitted and will be in recess for the morning.
judges: Roth , Thomas, Callahan